LUIS CARRILLO ET AL. *v.* KEITH
GOLDBERG ET AL.
(AC 34075)

Gruendel, Robinson and West, Js.

300

Argued December 5, 2012—officially released March 19, 2013

*Thomas J. O'Neill*, for the appellants (plaintiffs).

*Abram Heisler*, for the appellees (defendants).

*Opinion*

GRUENDEL, J. The plaintiffs, Luis Carrillo and Sandra Carrillo, appeal from the judgment of the trial court awarding them damages and interest for the failure of the defendants, Keith Goldberg and Leigh Ann Goldberg, to return their security deposit upon the termination of their lease in violation of General Statutes § 47a-21 (d), punitive damages and attorney's fees pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and interest pursuant to General Statutes § 52-192a. The plaintiffs claim that the court erred in (1) declining to award them double damages and interest pursuant to § 47a-21 (d) (2),[1] (2) miscalculating interest pursuant to § 47a-21 (i) (1),[2] (3) declining to award them treble damages pursuant to

---

[1] General Statutes § 47a-21 (d) (2) provides in relevant part: "Upon termination of a tenancy, any tenant may notify his landlord in writing of such tenant's forwarding address. Within thirty days after termination of a tenancy, each landlord other than a rent receiver shall deliver to the tenant or former tenant at such forwarding address either (A) the full amount of the security deposit paid by such tenant plus accrued interest . . . or (B) the balance of the security deposit paid by such tenant plus accrued interest . . . after deduction for any damages suffered by such landlord by reason of such tenant's failure to comply with such tenant's obligations, together with a written statement itemizing the nature and amount of such damages. Any such landlord who violates any provision of this subsection shall be liable for twice the amount or value of any security deposit paid by such tenant, except that, if the violation is the failure to deliver the accrued interest, such landlord shall only be liable for twice the amount of such accrued interest."

[2] General Statutes § 47a-21 (i) (1) provides in relevant part: "On and after July 1, 1993, each landlord . . . shall pay interest on each security deposit received by him . . . . On the anniversary date of the tenancy and annually thereafter, such interest shall be paid to the tenant or resident or credited toward the next rental payment due from the tenant or resident, as the landlord or owner shall determine. If the tenancy is terminated before the anniversary date of such tenancy, or if the landlord or owner returns all or part of a security deposit prior to termination of the tenancy, the landlord or owner shall pay the accrued interest to the tenant or resident within thirty days of such termination or return. . . ."

General Statutes § 52-564,[3] (4) awarding them insufficient punitive damages and attorney's fees for the defendants' CUTPA violation, (5) denying their request for posttrial discovery of the defendants' financial background and their motion for a hearing on punitive damages, (6) denying their motion for a hearing on attorney's fees and (7) declining to award them interest pursuant to General Statutes § 37-3a.[4] We affirm in part and reverse in part the judgment of the trial court.

The following facts found by the court and procedural history are relevant to our resolution of these claims. On July 23, 2007, the plaintiffs and the defendants entered into a lease agreement for the defendants' single-family home in New Canaan. The agreement provided for the plaintiffs to take possession of the home on August 31, 2007, and for the lease to terminate on August 30, 2008, with monthly rent payments of $4800. At the inception of the lease, the plaintiffs paid to the defendants a "security deposit" of $4800,[5] the first month's rent of $4800 and the last month's rent of $4800. The defendants opened checking and savings accounts at Wachovia Bank, depositing the "security deposit" and last month's rent into the savings account, and the first month's rent into the checking account. By October 1, 2007, the defendants had transferred $4800 from the savings account to the checking account, which was then used to satisfy the defendants' obligation to the

___

[3] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

[4] General Statutes § 37-3a provides in relevant part: "[I]nterest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909 . . . as damages for the detention of money after it becomes payable. . . ."

[5] "Security deposit" is the parties' denomination of this $4800 payment. We note that this characterization does not necessarily comport with the legal definition of a security deposit in Connecticut. We address this point in part I of this opinion.

real estate agent who had arranged the leasing of the home to the plaintiffs. On November 6, 2007, the defendants transferred another $3000 from the savings account to the checking account and immediately thereafter paid from the checking account a veterinary bill for that same amount of $3000. After making those transfers from the savings account to the checking account, the savings account was left with a balance of $1812.32.

In the spring of 2008, the basement of the house flooded, causing damage to the plaintiffs' personal property. The plaintiffs, with the defendants' consent, deducted $941 from the rent payment for March, 2008, as compensation for these damages. On March 5, 2008, the defendants transferred $941.43 from the savings account to the checking account, leaving the savings account with a balance of $19.38. By the conclusion of the plaintiffs' tenancy, a combined balance of less than $400 of the $9600 paid to the defendants for security and last month's rent remained in the checking and savings accounts.

The lease agreement contained a provision that allowed for its early termination at the defendants' option, with ninety days notice to the plaintiffs. At some point during the spring of 2008, the defendants gave such notice to the plaintiffs. The parties came to an agreement that the plaintiffs would vacate the premises by August 20, 2008. The plaintiffs withheld the rent payment for July, 2008, with the understanding that the last month's rent paid at the inception of the lease was to be applied as rent for July, 2008. For the additional twenty days in August that the plaintiffs occupied the premises, the plaintiffs paid a prorated rent amount of $3096.77. Two days before the agreed upon termination of the leasehold, the plaintiffs vacated the premises.

On September 28, 2008, counsel for the plaintiffs sent to the defendants, via overnight mail, a letter regarding the security deposit and advising them of their forwarding address. The defendants, however, the day before, had sent an e-mail to the plaintiffs that contained an accounting of claimed damages and setoffs against the plaintiffs' security deposit. After applying the plaintiffs' security deposit to the amount of claimed damages, the defendants' letter demanded payment of $6778.71 in compensation for their claimed damages. As articulated by the court, "the notable items claimed by [the defendants] as damages or setoffs are the following: $3698.91 in expenses for travel from California to Connecticut to inspect the premises, $941 for rent withheld for the month of March, 2008 . . . $4800 as an additional month's rent for holding over past August 13, 2008, $900 in legal fees and $1025 as costs of various items of physical damage." At trial, Keith Goldberg admitted that he and his wife, Leigh Ann Goldberg, were not entitled to any of the sum claimed as damages in his accounting sent to the plaintiffs, except for $231.80 in fuel oil expenses. Keith Goldberg, during his testimony at trial, claimed that his attorney, William Osterndorf, had advised him to claim these expenses. Osterndorf, when testifying at trial, denied giving Keith Goldberg such advice. In fact, he testified that he counseled Keith Goldberg that the travel expenses and additional month's rent were "questionable" claims for damages. The court found that the defendants' claimed damages were pretextual.

With respect to the plaintiffs' claim that the defendants failed to return their security deposit pursuant to § 47a-21 (d), the court found in favor of the plaintiffs, awarding them $4800 in damages, plus $216.56 in interest. The court, however, did not find that the defendants had triggered the double damages provision of § 47a-21 (d) because the defendants had sent a written

accounting of the damages within fifteen days of receiving notice of the plaintiffs' forwarding address. The court also found that the defendants' comingling of the plaintiffs' security deposit with their own funds and the use of the plaintiffs' security deposit for their own personal expenses violated § 47a-21 (h) (1), and also constituted CUTPA violations. As the court found that the defendants' behavior evinced either "reckless indifference to [the plaintiffs'] rights or [an] intentional and wanton violation of those rights," it awarded the plaintiffs $3000 in punitive damages, $2500 in attorney's fees and $119 in costs. In deriving those specific amounts, the court did not articulate its reasoning, simply stating that the facts and circumstances of the case supported such an award. The court found that the plaintiffs' claim that the defendants had committed statutory theft was without merit because the evidence presented at trial did not support the requisite finding of intent.[6] On November 1, 2011, the plaintiffs filed a motion to open the judgment and to reargue and for hearings on punitive damages and attorney's fees. The court denied their motion on November 8, 2011. This appeal followed.

I

## DOUBLE DAMAGES AND INTEREST
## PURSUANT TO § 47a-21

We address first the plaintiffs' claim regarding the court's failure to award them double damages under

---

[6] The court did not specify its rulings with respect to the plaintiffs' breach of fiduciary duties and breach of contract claims. As the judgment file states, however, that the court found "the issues on the [c]omplaint for the [p]laintiffs," we conclude that this is an appealable final judgment. See *Rent-A-PC, Inc.* v. *Rental Management, Inc.*, 96 Conn. App. 600, 604 n.3, 901 A.2d 720 (2006) ("[a]lthough it is preferable for a trial court to make a formal ruling on each count, we will not elevate form over substance when it is apparent from the memorandum of decision that the trial court found in favor of the plaintiff"). Moreover, we need not address specifically the claims of breach of fiduciary duty or breach of contract, as they are not the subject of this appeal.

§ 47a-21 (d). The plaintiffs argue that the court's award of only $4800 for the defendants' failure to return their security deposit was improper because § 47a-21 (d) requires an award of double damages when a tenant's security deposit is not returned in the fashion prescribed by this subsection.[7] We agree.

"We accord plenary review to the court's legal basis for its damages award. See *First Federal Savings & Loan Assn. of Rochester* v. *Charter Appraisal Co.*, 247 Conn. 597, 603, 724 A.2d 497 (1999). The court's calculation under that legal basis is a question of fact, which we review under the clearly erroneous standard. *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 28, 664 A.2d 719 (1995)." *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 103, 920 A.2d 357, cert. denied, 284 Conn. 901, 931 A.2d 261 (2007).

Before we can resolve the question of whether the court erroneously failed to award the plaintiffs double

---

[7] The plaintiffs also contend that the court erred in failing to double the interest awarded to them under § 47a-21 (d) and (i). We decline to review this claim, however, because it was inadequately briefed. "[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *Paoletta* v. *Anchor Reef Club at Branford, LLC*, 123 Conn. App. 402, 406, 1 A.3d 1238, cert. denied, 298 Conn. 931, 5 A.3d 491 (2010). The plaintiffs, in their brief to this court, merely employ a paraphrasing of the language of § 47a-21 (d) to stand for the proposition that the trial court erred in declining to award double the accrued interest on the plaintiffs' security deposit. Failing to set forth an analysis of the statutory language and how that language applies to the facts of their case, the plaintiffs have provided us with inadequate briefing. Loathe to become " 'an advocate for any party'," we, accordingly, decline to review this claim. Id., 408.

the amount of their security deposit, it is necessary to set forth the applicable definition of "security deposit." Section 47a-21 (a) (10) defines a "security deposit" as "any advance rental payment other than an advance payment for the first month's rent . . . ." While in common parlance a "security deposit" may have a conceptually distinct meaning from an advance payment of periodic rent, under Connecticut law, the term "security deposit" comprises all forms of advance rental payment, regardless of its intended use. According to the statutory definition, therefore, the total amount of the security deposit collected from the plaintiffs was $9600.

We turn now to the issue of whether the court improperly failed to double the plaintiffs' security deposit in its award of damages. In its memorandum of decision dated October 13, 2011, the court found that the double damages provision of § 47a-21 (d) (2) had not been triggered in this case. The court reasoned that the defendants had provided an accounting of claimed damages to the plaintiffs before the plaintiffs sent the defendants notice of their forwarding address, thereby precluding an award of double damages pursuant to § 47a-21 (d) (2). As the court's finding is contrary to the language of § 47a-21 (d) (2), we conclude that the court erred in declining to award the plaintiffs double their security deposit in damages.

Section 47a-21 (d) (2) provides in relevant part: "Upon termination of a tenancy, any tenant may notify his landlord in writing of such tenant's forwarding address. Within thirty days after termination of a tenancy, each landlord . . . shall deliver to the . . . former tenant at such forwarding address either . . . the full amount of the security deposit . . . plus accrued interest . . . or . . . the balance of the security deposit paid by such tenant plus accrued interest . . . after deduction for any damages suffered by such landlord by reason of such tenant's failure to comply with

such tenant's obligations, together with a written statement itemizing the nature and amount of such damages. Any such landlord who violates any provision of this subsection shall be liable for twice the amount or value of any security deposit paid by such tenant, except that, if the violation is the failure to deliver the accrued interest, such landlord shall only be liable for twice the amount of such accrued interest."

Section 47a-21 (d) (4) addresses the circumstance where a landlord lacks notification of a former tenant's forwarding address: "Any landlord who does not have written notice of his . . . former tenant's forwarding address shall deliver any written statement and security deposit due to the tenant, as required by subdivision (2) of this subsection, within the time required by subdivision (2) of this subsection or within fifteen days after receiving written notice of such tenant's forwarding address, whichever is later."

The court appears to have interpreted these statutory provisions as allowing a landlord to substitute a fabricated accounting of damages for the return of a tenant's security deposit in order to avoid the sanctions of § 47a-21 (d) (2). It appears, further, that the court interpreted these provisions to excuse a landlord from the sanction of double damages if the landlord has not received written notice of the tenant's forwarding address prior to sending to the tenant a written accounting of damages. We conclude that this reading does not comport with the language of the statute.

Section 47a-21 (d) (2) requires, in the circumstance where the landlord does not return the entire security deposit, that the landlord return to the tenant *both* the "balance of the security deposit paid . . . after deduction for any damages" caused by the tenant *and* "a written statement itemizing the nature and amount of such damages. . . ." If a landlord does not comply with

these requirements, the sanction is clear: the landlord "shall be liable for twice the amount . . . of any security deposit paid . . . ." General Statutes § 47a-21 (d) (2).

With respect to the time period during which a landlord must fulfill the requirements for the proper return of a tenant's security deposit, the language of the statute is similarly clear. Reading together subdivisions (2) and (4) of § 47a-21 (d), if the landlord has received written notice of the tenant's forwarding address, the landlord must return the deposit, or balance thereof, along with any written accounting of damages, within thirty days of the end of the tenancy. If the landlord does not receive written notice of the tenant's forwarding address by the end of the tenancy, the landlord must return the deposit by the later of either thirty days after the end of the tenancy or fifteen days after receipt of the written notice of the tenant's forwarding address.

As the court found, the defendants' claimed damages were pretextual, that is, they were calculated to camouflage the defendants' mishandling of the plaintiffs' security deposit. The statute allows for deductions to compensate for damages "suffered by [the] landlord by reason of [the] tenant's failure to comply with such tenant's obligations . . . ." General Statutes § 47a-21 (d) (2). In this case, however, the damages claimed by the defendants were neither suffered by the defendants nor created by the plaintiffs' failure to comply with their obligations as tenants. Rather, they were simply fabricated by the defendants and, therefore, were not properly withheld by the defendants under § 47a-21 (d) (2). The language of the statute allows for landlords to deduct from a tenant's security deposit actual damages, not pretextual damages. While the defendants complied, in form only, with the requirement that a written accounting of damages be sent to the former tenant within the time frame prescribed by § 47a-21 (d) (2)

and (4), without also sending the plaintiffs the balance of the security deposit legitimately owed to them, they did not satisfy the statutory requirements. Accordingly, the defendants were subject to the doubling of damages under § 47a-21 (d) (2). We, therefore, conclude that the court improperly failed to award the plaintiffs damages equal to the amount of double their security deposit.

The plaintiffs next argue that the court calculated the accrued interest required to be delivered to tenants under § 47a-21 (i) on the incorrect amount of the security deposit they paid to the defendants. They argue that the court should have calculated interest pursuant to § 47a-21 (i) on the entire $9600 paid to the defendants at the inception of the lease. We agree.

As we previously discussed, § 47a-21 (a) (10) defines a "security deposit" as "any advance rental payment other than an advance payment for the first month's rent . . . ." Under § 47a-21 (i), a landlord "shall pay [to the tenant] interest on each security deposit received by him . . . ." Together, these provisions require that a landlord pay to the tenant interest on any advance rental payment, other than a payment for the first month's rent. At the inception of the lease, the defendants collected from the plaintiffs $9600 in advance rental payments. Pursuant to § 47a-21 (i), the defendants were required to pay interest on the entire $9600 advance rental payment. As the court awarded to the plaintiffs interest only on $4800, rather than the $9600 paid in advance by the plaintiffs, we conclude that the court erroneously calculated its interest award.

## II

### TREBLE DAMAGES FOR STATUTORY THEFT

The plaintiffs next argue that the court improperly failed to award them treble damages for statutory theft pursuant to § 52-564. We disagree.

In its memorandum of decision, the court found "no merit to the plaintiffs' claim" sounding in statutory theft. The court, accordingly, did not award the plaintiffs damages of any kind for this claim. The plaintiffs argue that the facts of the present case support a finding of statutory theft and, therefore, the court erred in failing to award them treble damages allowed by § 52-564 in cases of statutory theft. The plaintiffs, on appeal, however, challenge the court's failure to award damages, not the propriety of its finding that the evidence presented did not support the conclusion that the defendants had committed statutory theft. Accordingly, we address only, upon the court's finding that the plaintiffs' claim of statutory theft was meritless, whether the court was correct in declining to award treble damages. We conclude that in light of such a finding, the court's declining to award treble damages was entirely proper.

## III

### PUNITIVE DAMAGES PURSUANT TO CUTPA

The plaintiffs contend that the court erred in (1) awarding them the insufficient amount of $3000 in punitive damages, (2) denying their motion for a posttrial hearing on the appropriate amount of punitive damages and (3) denying their request for posttrial discovery on the defendants' financial background. We disagree with each of these contentions.

### A

We address first the plaintiffs' claim that the court's award of $3000 in punitive damages was insufficient. We are not persuaded.

"General Statutes § 42-110g provides in relevant part that [a]ny person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover

actual damages. . . . The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper. [A]warding punitive damages under . . . CUTPA is discretionary . . . and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Advanced Financial Services, Inc.* v. *Associated Appraisal Services, Inc.*, 79 Conn. App. 22, 33–34, 830 A.2d 240 (2003). We note also that "the CUTPA statutes do not provide a method for determining punitive damages . . . ." (Internal quotation marks omitted.) Id., 34.

As CUTPA does not prescribe an approach for calculating punitive damages but, instead, leaves this determination to the discretion of the trial court, in order to prevail on appeal, the plaintiffs must show that the court's award of $3000 was an abuse of its discretion. Upon review of the record before us, we conclude that the plaintiffs have failed to demonstrate that the court, in awarding $3000 in punitive damages, abused its discretion or that injustice was done with this award.

B

We address next the plaintiffs' claim that the court erroneously denied their motion for a hearing on the appropriate amount of punitive damages. We disagree.

"It is undisputed that, before trial, [a] court properly [may bifurcate] the liability and damages phases of [a] trial and [allow] the introduction of new evidence and new arguments in the damages phase. . . . When neither party has reason to believe that the trial has been bifurcated, however, the only function of a posttrial damages hearing would be to allow the party claiming damages a second bite at the apple." (Citation omitted.) *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 253, 919 A.2d 421 (2007).

The plaintiffs cite no evidence in the record, nor could we locate any, that indicates that either party requested or expected that the trial would be bifurcated with a posttrial damages hearing.[8] We conclude, therefore, that the court had no authority to grant the plaintiffs' motion for a posttrial punitive damages hearing and, accordingly, did not err in denying the plaintiffs' motion.

C

With respect to punitive damages, the plaintiffs' final claim is that the court improperly denied their request for posttrial discovery on the defendants' financial background. The plaintiffs argue that because the purpose of punitive damages under CUTPA is deterrence, the court should have granted discovery into the defendants' financial circumstances so that it could determine the amount of punitive damages that would deter the defendants from violating CUTPA in the future. We do not agree.

In the pretrial period, the plaintiffs made several requests for production of the banking records pertaining to the defendants' checking and savings accounts opened at the inception of the lease agreement. On July 1, 2011, the plaintiffs also made forty-two requests for admission, many of which concerned the defendants' banking practices. The record, however, does not contain any pretrial discovery requests by the plaintiffs related to the defendants' general financial condition. When the wealth of the defendants was broached by the defendants' counsel during

---

[8] Although some CUTPA cases might exist where "there may be some evidence that is collateral or irrelevant to the merits of a claim of CUTPA violation or proof of damages . . . [they nonetheless] may be relevant to proving whether punitive damages are warranted." *Jacques All Trades Corp.* v. *Brown*, 42 Conn. App. 124, 131–32, 679 A.2d 27 (1996), aff'd, 240 Conn. 654, 692 A.2d 809 (1997). This is not such a case. In fact, both parties had the opportunity at trial, of which they took advantage, to present evidence and argument on the issue of punitive damages. Moreover, neither the parties nor the court reserved presentation on such issue until a subsequent hearing.

redirect examination, Keith Goldberg acknowledged that he was "a person of some means" and could have paid the plaintiffs their security deposit if he had known he was required to do so. The plaintiffs did not conduct a recross-examination of Keith Goldberg in order to pursue further this topic.

"We have long recognized that the granting or denial of a discovery request rests in the sound discretion of the [trial] court, and is subject to reversal only if such an order constitutes an abuse of that discretion. . . . [I]t is only in rare instances that the trial court's decision will be disturbed. . . . Therefore, we must discern whether the court could [have] reasonably conclude[d] as it did. . . . When reviewing claims under an abuse of discretion standard, the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . ." (Citation omitted; internal quotation marks omitted.) *Blumenthal* v. *Kimber Mfg., Inc.*, 265 Conn. 1, 7, 826 A.2d 1088 (2003).

Given that the plaintiffs had included in their complaint a prayer for punitive damages and had ample opportunity in the nearly three years before trial to request discovery related to the financial condition of the defendants, we conclude that the court's denial of the plaintiffs' request was a reasonable exercise of its "inherent managerial power to impose reasonable limits on discovery"; *Ramin* v. *Ramin*, 281 Conn. 324, 342 n.8, 915 A.2d 790 (2007); and, therefore, not an abuse of its discretion.

IV

ATTORNEY'S FEES PURSUANT TO CUTPA

The plaintiffs next argue that the court erred in (1) awarding $2500 in attorney's fees and (2) denying their motion for a hearing on the reasonableness of these

fees. We agree with the plaintiffs that the court erred in awarding $2500 in attorney's fees and, accordingly, need not reach the issue of whether the court improperly denied their motion for a hearing on attorney's fees.

At trial, Luis Carrillo testified that he paid approximately $35,000 in legal fees in pursuing this action. Before the close of evidence, the court accepted into evidence a detailed accounting of the services performed by the plaintiffs' attorney and the fees associated with these services. The accounting revealed that over a three year period the plaintiffs' counsel devoted in excess of ninety hours to this case, billed at a rate that started at $415 per hour.[9] The majority of these hours accumulated in an effort to have the defendants comply with discovery requests, to settle with the defendants who were unwilling to do so or to move for default after the defendants' repeated failures to plead and to appear in court as they were so ordered. The plaintiffs' counsel explained, when submitting the accounting to the court, that the accounting did not include the time expended preparing for and attending trial. The court then stated that the trial time amounted to approximately four hours and inquired as to the amount of time the plaintiffs' counsel had spent in preparation for trial. The plaintiffs' counsel estimated that he had spent ten hours, but could provide a more precise accounting using his firm's billing system. At no time did the defendants offer any evidence on the issue of attorney's fees. The only argument heard by the court regarding the reasonableness of the attorney's fees was the assertion of the defendants' counsel that attorney's fees of $45,000 "in connection with this" was "outrageous."

"The public policy underlying CUTPA is to encourage litigants to act as private attorneys general and to

---

[9] During this matter's three year litigation period, the hourly rate charged by the plaintiffs' counsel increased from $415 per hour to $455 per hour.

engage in bringing actions that have as their basis unfair or deceptive trade practices. . . . In order to encourage attorneys to accept and litigate CUTPA cases, the legislature has provided for the award of attorney's fees and costs." (Citation omitted; internal quotation marks omitted.) *Jacques All Trades Corp.* v. *Brown*, 42 Conn. App. 124, 130–31, 679 A.2d 27 (1996), aff'd, 240 Conn. 654, 692 A.2d 809 (1997). "[T]he amount of attorney's fees that the trial court may award is based on the work reasonably performed by an attorney and not on the amount of recovery." Id., 131. "Once liability has been established under CUTPA, attorney's fees and costs may be awarded at the discretion of the court. . . . We will not interfere with the trial court's exercise of this discretion unless there is manifest abuse or injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) Id.

"[T]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. . . . The courts may then adjust this lodestar calculation by other factors [outlined in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)].[10] . . . The *Johnson* factors may be relevant in adjusting the lodestar amount, but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of

---

[10] "The *Johnson* court set forth twelve factors for determining the reasonableness of an attorney's fee award, and they are: the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal services properly; the preclusion of other employment by the attorney due to acceptance of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; the 'undesirability' of the case; the nature and length of the professional relationship with the client; and awards in similar cases." *Laudano* v. *New Haven*, 58 Conn. App. 819, 823 n.9, 755 A.2d 907 (2000).

the number of hours expended on the litigation." (Citation omitted; internal quotation marks omitted.) *Laudano* v. *New Haven*, 58 Conn. App. 819, 822–23, 755 A.2d 907 (2000).

While the court did not articulate how it determined the $2500 award for attorney's fees, by any calculation, it made a drastic reduction from any conceivable lodestar amount. In light of the fact that the defendants presented no evidence that the attorney's fees detailed in the accounting provided by the plaintiffs' counsel were unreasonable and that the public policy underlying the award of attorney's fees in CUTPA cases is to encourage the pursuit of actions arising from unfair trade practices, we conclude that the court's nearly 95 percent reduction in the award of attorney's fees was an abuse of its discretion.

V

PREJUDGMENT INTEREST PURSUANT TO § 37-3a

Finally, we address the plaintiffs' claim that the court erred in not awarding them prejudgment interest pursuant to § 37-3a. We conclude that the court did not so err.

"The allowance of prejudgment interest as an element of damages is an equitable determination and a matter lying within the sound discretion of the trial court. . . . The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through an application of an arbitrary rule." (Internal quotation marks omitted.) *Stratford* v. *A. Secondino & Son, Inc.*, 133 Conn. App. 737, 749, 38 A.3d 179, cert. denied, 304 Conn. 918, 41 A.3d 305 (2012).

"Although the determination as to whether prejudgment interest under § 37-3a should be awarded may depend on whether detention of money is wrongful, [t]he allowance of interest as an element of damages

is . . . *primarily an equitable determination and a matter lying within the discretion of the trial court.* . . . [D]iscretion imports something more than leeway in decision-making. . . . It denotes the absence of a hard and fast rule or a mandatory procedure regardless of varying circumstances." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 750–51. While "our law recognizes prejudgment interest as a component of damages, it does not follow that it must be awarded." Id., 751.

The plaintiffs argue that because the defendants' detention of their money was wrongful, the court should have awarded prejudgment interest. While the plaintiffs have provided us with a hypothetical rationale for why the court could have exercised its discretion to award prejudgment interest, they have not shown how, on this record, the court abused its discretion by choosing not to award it. Absent such a showing, we will not disturb the decision of the court.

The judgment is reversed only as to the award of damages and accrued interest pursuant to § 47a-21 and the award of attorney's fees pursuant to CUTPA, and the case is remanded with direction to recalculate those awards in accordance with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.